Good morning, Your Honors. May it please the Court. Jagdeep Singh Sikham on behalf of Petitioner Narinderji Singh. And Your Honors, as you know, we have both the prejudice issue and the ineffective assistance of counsel issue. So I invite the Court's direction as to what the Court is going to focus on. I will focus on the ineffective assistance of counsel issue first. And as the Court has noted in the previous argument, the BIA does have the LAZADA requirements. And I would like to clarify, Your Honors, that our position here is that there's nothing wrong about the LAZADA requirements, that they are very reasonable, and that in most cases the strict compliance should be required. But also in practice, what the LAZADA requirements do, they almost always automatically establish an effective assistance of counsel. If a movement complies with LAZADA, then the factual predicate is established. However, that shouldn't be the only way that you can establish the factual predicate. You should be able to based on the record. And the problem becomes when the Attorney General's Office denies a motion to reopen when the evidence is established as a Fifth Amendment violation, but still denies the motion merely because one of the LAZADA requirements were not fulfilled. Because the right to effective assistance of counsel is not simply the result of LAZADA, but is a Fifth Amendment right. And so the ultimate issue really should be whether or not the movement establishes factually that they've had a Fifth Amendment violation. And this Court has, of course, recognized that, and this Court has consistently held that if you have substantial compliance with LAZADA and the record evidences that there's been a Fifth Amendment violation, then the movement is entitled to reopening. In this case, Your Honors, we do have substantial compliance with LAZADA. There are affidavits to support the ineffective assistance. In addition to that, you have the counsel. Are you the one, or is it your brother? It was my brother, Your Honors. Yes. Is he still a part of your firm? Yes, Your Honor. And you have the counsel stating the facts, so there's really no factual dispute. And, in fact, I don't think there was ever any argument below, and it's a little bit unclear to me what Respondent's Petition, Respondent's Petition. Could you add just one thing? One of the rationales for LAZADA is to avoid collusion between attorneys and their clients, to have the attorney take the hit for what is the client's clear failure to show up or whatever in this case. Now, why in this case do you think that that isn't a possibility? Well, Your Honors, I think that Lowe is helpful in this because Lowe talks about if you have a non-citizen who's appearing at all their hearings, and here we have someone who was appearing before and is appearing after. So that's, I think, one dimension that helps us. I also am a little bit unclear. Thank you, Your Honor, for articulating that. I wasn't sure what they meant, who the collusion would be between. But I think in this case you also have corroborating evidence, affidavits from other people, too, stating the same thing. So I think, you know, at least that should be addressed by the Attorney General, whether if they're going to require that strict compliance, then they should explain why. And I don't think there was really an allegation here by anyone that there was collusion. If we turn to the question of prejudice, does your ability to show entitlement to asylum depend on the findings of lack of credibility with respect to the Convention against Torture aspect? I believe it did, Your Honor. I think this Court has come down with Azenor since we didn't submit a 28-J letter on Azenor, which seemed to state that if there's a denial of the proper legal standard, application of the proper legal standard, entitles one to reopening. But I think in this case, yes, that is our position, that if we couldn't show that our client had a viable asylum claim, then there would not be prejudice. So we would have to show there's a viable asylum claim, and, yes, the issue of credibility would be raised. You have a bit of a problem, don't you? I mean, with the wedding date, that's fairly difficult. You get a couple of documents from the former wife and from your own client who put the wedding date about four years out of sync. Yes, Your Honor. I would agree, except in this case, I think we have to look at the circumstances of those documents. First of all, you know, this Court has never really put a lot of weight on collateral applications, and that's really what this was, a marriage petition that was submitted by the noncitizen, by Mr. Dillon. Well, the G-325A shows the date of the marriage is 1992. He submitted that document, didn't he? He did submit that document. That blows his entire testimony halfway out of the water because he sticks like glue to the 1996 date, and then you have the affidavit of the wife. So isn't that a substantial basis for anyone to conclude that this man's testimony is suspect? Yes, Your Honor, but he never ---- He put this document in himself to the immigration process. Yes, Your Honor, but he never pursued that application, and I have to ---- Which one is a fraud? Well, Your Honor, I don't think it was a fraud. I think it was an ill-prepared application. I don't think it was a fraud. If he would have went somewhere, would have been interviewed about that application and said and actually tried to secure that relief, then that we would have a different story. Here we have some ---- That's the problem, story. But you think were both documents prepared by the same person, so if there was an error in date, it's explainable? They're two separate documents, both of which say 1992. Well, the problem, again, is because Mr. Dillon didn't pursue the application, he was really unaware of these documents at the time. One. So he didn't really have ---- I'm sorry. Didn't he sign one? Yes, he did sign one, but it was not in his native language, so he never had the benefit of an interview to discuss, you know, what ---- why he has these ---- this inconsistency in dates. But he continues to dispute the wife's testimony, the written testimony. The wife was quite specific in saying that they were married in 1992, they lived together for a year, separated in 1993 because they began to have some substantial differences between them. So it's not ---- sometimes we see a document where there could well be a Scrivener's error, but this is not that kind of a document. Yes, Your Honor. And, again, I think it would cause a bigger problem if the application was pursued or there was some way to authenticate or there was some explanation around that document. What we have here is we have an application submitted that was completely abandoned. So, you know, Mr. Dillon was never confronted at any time previous to this asylum hearing about this document. It corroborates his wife's testimony, though, and he continues to say, I wasn't married in 1992, I was married in 1996. Yes, sir. So you have a dispute between the wife and his own documentary corroboration of what his wife said. Yes, sir. Isn't that a substantial basis for somebody in the INS mechanism to conclude there's a problem with credibility here? Yes, sir. And if there is a problem, and, again, if this was the only ---- I do think we can diminish the weight of this document, Your Honor, based on the entire circumstances. However, this is not the only evidence in this record. You have very consistent testimony. And I think if you didn't have this document, you really wouldn't have a ---- his testimony standing alone would be enough. And then you have a lot of corroborating evidence, including a live witness. If I was ---- you know, if we stripped away this other corroborating evidence, the live witness, then I think we would have ---- this document might be enough, as Your Honor said, to blow his testimony out of the water. But I think we have to look at the corroborating evidence of the live witness who was subject to cross-examination. Who also knew the Respondent's wife, knew he was married, but didn't know when. Yes, Your Honor. Yes, he did not know when. But he did corroborate the fact that he was arrested and persecuted, Your Honor. That's the fundamental issue in the case. Again, this doc ---- I also feel that we didn't have a marriage certificate nor a divorce certificate. So, again, this is Mr. Dillon's testimony was pretty consistent that he was married and he was ---- and his marriage was annulled. His marriage was never consummated. He left India shortly after his marriage. I ---- that's ---- I said I think if you look at this testimony and his explanation, then the weight of this document that was floating around in the INS system that Mr. Dillon never testified about, no one ever reviewed, is consistent with his testimony. Thank you. Thank you, Your Honor. Thank you. Please, the Court. I'm Mike Wiggins for the Respondent. I think this case illustrates the wisdom of the Lozada's requirements, particularly the third requirement in a case such as this one, which, as you point out, would at least put some impediment up to prove a more likelihood of a validity of the complaint of ineffective assistance of counsel. It would tend to help smoke out collusive efforts. Yes, but, see, normally the case is that the counsel who's coming on motion to reopen is laying it off on former counsel. Now you have the same counsel coming forward and confessing error, and is therefore, as an officer of the court, presumably about as good as you're going to get. I mean, at least in that case, you've got the party who committed the clear error telling you what you want to know. And they have to show up, and unless they're a one-shot deal in the immigration courts, it seems to me that's a pretty good check on credibility and confirmation that somebody's willing to acknowledge that ineffective assistance of counsel happened. And that's what Lowe relied on. It is a check, Your Honor, but it is different from Lowe in this respect. Lowe, there was an affidavit filed by the Petitioner in which they explained the reason for not filing a bar complaint. We could only find two cases where the same attorney was retained to argue that he had been ineffective in providing counsel in one of these proceedings. One was Lowe. The other one is Rojas v. Garcia. And in neither one of those cases did they completely avoid any sort of compliance at all with the third prong of Lozada. In Rojas, the attorney self-reported to the bar. But this case is unusual, and the story in respect to the reason for their not appearing on time seems believable, accurate, compelling. And it's the rest of his case that's a problem. We believe the rest of his case is a problem, Your Honor, although we do think that compliance with Lozada is necessary in this case. We think that the absence of, or let me put it this way, the presence of the same attorney arguing that he was ineffective by filing a bar complaint or at least explaining to the board or the IJ why no bar complaint was filed at least tends to show that it's a more serious complaint, and they take it seriously. Not that they didn't, not that they didn't confess it, but these extrinsic measures tend to show and tend to provide corroboration to that. And as you've noted, it's not an inflexible requirement in Lozada. This Court has allowed substantial compliance, but never in a case that we could find where the same attorney was there, has the Court allowed or permitted no compliance with the third prompt. Well, let's be practical. They have confessed error. That's something that's difficult for any lawyer to do. They've come forward to the Immigration Service and to us and say we really blew it. We're going ahead to represent the client and we're going to do the very best we can to represent him well from now on. Should they also turn themselves in to the bar? Well, certainly Lozada would anticipate where there are allegations of legal or ethical improprieties that a bar complaint is filed. Oh, let's be practical. It tends to help police the immigration bar. It illustrates the standards that the bar should achieve. And it provides a measure, some measure of seriousness of the complaint. To what extent does, and I take your point. I'm curious, though. If it goes to, in this case, the California State Bar, right, do they have a section that really monitors immigration lawyers better than or different from any monitoring that's done by the BIA group, you know, the immigration group itself, the court system there? I'm afraid I can't answer that question. So that's why I was saying officer of the court and the like, we can sort of monitor the attorneys that come before us and are doing it in the immigration field beginning to. But to say it goes to the State Bar, that that's something that should tip the scale when you've actually got the attorney confessing error to the very body in which they presume to, at least a substantial part of their practice, specialize. That's what I'm wondering if it's not a technicality to say they should also self-report to the bar. Not that they shouldn't, but that that should be the linchpin. I don't think it's a technicality, Your Honor. It's, I would hope that lawyers would never collude with clients, but I believe that it could happen, and I think that's the purpose of this requirement. Thank you. Turning to the Convention Against Torture, we think that the findings of credibility of the IJ would preclude the Petitioner from showing prejudice in effective assistance to counsel. And we think that there's substantial evidence in the record to support the IJ's findings of lack of credibility. The only thing that appears not to be credible is the matter of his marriage. As to other matters in the actual torture, there didn't seem to be any lack of consistency or credibility there. So it really turns on how much weight we put on this marriage, either deception or whatever. Well, certainly the date of the marriage is key to the Petitioner's claim, and there's substantial doubt created by the documents that the Petitioner submitted. But we would argue that there are other inconsistencies in the record as well. What about the asylum officer's report on the assessment to refer, the bottom paragraph on page 189? Applicant's testimony. This is by Asylum Officer Johnson. Applicant's testimony was found not credible because of a material inconsistency. Applicant testified police tried to arrest him on August 96. When questioned whether the police target Federation members for that reason alone, Applicant agreed that they aren't arrested and then changed his testimony. This explanation is implausible. So that's another problem, isn't it? That's another problem. He also, it's noted in there that after his second arrest, I think it says he was detained for six days. His testimony at trial was that he was detained for one day. And he did not mention in the asylum officer's interview that his father was arrested at the same time. And the asylum officer who refers this to the IJ says this is material, this change in testimony, because he maintains that he left India and fears future persecution because of the attempt at arrest. As applicant's testimony was not credible in material respects, he's failed. So that was the first level at which he failed on a credibility determination. And that's in the administrative record also. We also think that the letter from the doctor that he submitted tends to cast doubt upon his testimony. His testimony was that he was in the hospital for five months, that he had a broken leg, and that he was treated by Dr. Joe Hall. The letter from the doctor indicates that he was treated for severe contusions. Acute contusions on his legs and back. Given ointments, pills, and I think an injection. But the doctor makes no mention of a broken leg, nor does he make mention of what I would think would be an extraordinary fact, of a stay of five months' duration in the hospital. I treated him for injuries to relieve his pain as well as swelling. There's no showing of anything broken. Is that what your point is? Yes. The explanation for that was that another doctor, after the swelling went down, found that there was a fracture. Another doctor who worked with Dr. Joe Hall. And I think it strains, we think it strains credulity that Dr. Joe Hall could see the patient for five months and not notice a cast on his leg or that the doctors did not consult. Clearly, it's not dispositive, but certainly a finder of fact could find that it's inconsistent. I see that my time is up, if you have no further questions. Thank you, counsel. You may respond. Your Honor, I would like to mention the two other points you've raised regarding credibility and counsel has. As far as, Your Honor, the assessment to refer, these assessments are often submitted below, before the immigration court, because most cases this court, of course, looks at have come from an assessment to refer. And generally, they should be, they're officer's notes that result in this summary. And as I, if I look, recall the immigration judge's decision and try to remember back at the hearing, I don't think those notes were submitted and I don't think the immigration judge really. Well, the way I read the record, the immigration judge confronted your client with those, with that information. Your client denied it. So you had a dispute between the officer and your client. And that was resolved against your client. I think, Your Honor, I don't, if I recall the immigration judge's decision, I don't think he really relied on the assessment to refer as one of the reasons for his credibility finding, because, you know, the routine would usually be, if the court was going to look at the assessment to refer or afford it, wait, the asylum officer is readily available to testify. And sometimes, you know, you get an opportunity to review their notes and cross-examine them or the asylum applicant gets to cross-examine the asylum officer. So when you just have this assessment to refer that's in the record, usually it's not afforded that much weight until the asylum officer does testify. And when there's a more damning assessment to refer, then usually the INS or now the Department of Homeland Security will present the asylum officer. But in this case, they decided not to do so. So, you know, what we have is I don't, that's why I don't think there was a reliance on the asylum interview as a grounds for not finding Mr. Dillon credible. The second thing, Your Honor, I do want to mention that with regard to the doctor's letter, I find it consistent and Mr. Dillon testified about his medical treatment and how he was treated prior to the presentation of the doctor's letter. He did state that his fracture was discovered after he got treatment for Dr. Dole. So I think it would be inconsistent for Dr. Dole to say that he provided treatment that he did not provide. Thank you. The Respondent was asked if he ever told the asylum officer at his interview that his brother was never released from police custody. The Respondent denied making that statement, but the asylum officer's assessment referral memorandum reflects that he made the statement. Yes, Your Honor. The court gave the assessment referral memorandum diminished weight because the asylum officer was unavailable, not subject to cross, but it was part of the record and considered. Yes, Your Honor. That's why, and it's based on that statement that I don't think the immigration, I don't think we can say the immigration judge relied on it. He did make the observation going through the statement of facts, and I think, and I'll just explain to Your Honor that the routine is that if the immigration court is going to rely heavily on. . . He said he gave it diminished weight. Yes, Your Honor. So it wasn't, yeah, so I think usually if you are going to rely on assessment referral because the asylum office is in San Francisco, you know, then the Department of Homeland Security, when they want to, I guess, you know, verify statements made at the asylum interview, what they normally do would present the asylum officer, and then, yes, and that would then, of course, elevate the weight given to the assessment referral.  Thank you, counsel. Thank you, Your Honor. This is order submitted. And we'll move to Sayle versus Ashcroft. Or Sayle. Sayle. Good morning. Robert G. Ryan for the. . .
judges: B. Fletcher,trott, Fisher